932 So.2d 230 (2005)
D.B., the Mother, Appellant,
v.
DEPARTMENT OF CHILDREN AND FAMILIES, Appellee.
J.J., the Father, Appellant,
v.
Department of Children and Families, Appellee.
Nos. 4D05-849, 4D05-990.
District Court of Appeal of Florida, Fourth District.
September 7, 2005.
*231 Karen Martin of Karen Martin, P.A., West Palm Beach, for appellant D.B., the Mother.
Frank A. Kreidler, Lake Worth, for appellant J.J., the Father.
Jeffrey Dana Gillen, Department Attorney, West Palm Beach, for appellee.
John Walsh, Attorney Ad Litem, Legal Aid Society of Palm Beach County, Inc., West Palm Beach, for minor children J.J. and C.J.
SHAHOOD, J.
Appellants, D.B., the mother (mother), and J.J., the father (father), each appeal from an Order Granting Termination of Parental Rights and Permanent Commitment. The minor children of the appellants are J.J. born May 4, 2000, and C.J. born August 10, 2001. These appeals have been previously consolidated for record purposes only. We now sua sponte consolidate the appeals for all other purposes including this opinion.
We affirm the order appealed in all respects both as to the mother and father. We distinguish this case from this court's recently issued opinion in K.J. v. Department of Children & Family Services, 906 So.2d 1183 (Fla. 4th DCA July 2005). In K.J. we held that the order was not supported by clear and convincing evidence.
In this case, we hold the order is supported by clear and convincing evidence. Where, as in the instant case, the record supports a finding of ongoing neglect, and/or abuse over a period of years, together with non-compliance with the case plan, we will not disturb the trial court's ruling. Further, as in this case, we will not disturb the court's ruling where the manifest best interests of the child or children favor an existing opportunity for adoption. In support, we adopt the well-written order of the trial court, which states in pertinent part the following:
4. Both children were placed in shelter with the Department of Children and Families (DCF) by Order dated January 16, 2003. The children were adjudicated dependent on May 5, 2003;
. . . .
6. The parents were offered separate case plans which were approved by the Court on June 5, 2003. The case plans had a goal date of September 15, 2003, supporting concurrent goals of reunification and adoption. The goal dates of the case plans were extended to January 16, 2004.

*232 The case plans for the parents were similar. Each parent was required to complete the following tasks:
a. psychological evaluation and any recommended treatment;
b. parenting effectiveness training;
c. substance abuse evaluation and "follow all treatment and recommendations to outpatient, detoxification and/or residential treatment if necessary"
d. stable, hazardous-free housing independent from others and a verifiable legal source of income for a minimum of six (6) months;
e. pay $200.00 a month child support for the children while they are out of parental custody;
f. the Mother was also required to attend individual counseling.
7. [J.J.] and [C.J.] are two young boys who have spent 2 years in foster care. For [J.J.], this amounts to half his life. For [C.J.], the time in foster care amounts to almost two-thirds of his life. Both children spent the first part of their lives with their parents, [J.J.] and [D.B.]. During the Mother's pregnancy with [J.J.] she tested positive for cocaine, triggering an abuse report upon her first son's birth.
The Mother was arrested for aggravated battery in July 2000. She was arrested for stabbing the children's Father. This incident triggered a second abuse report. The child, [J.J.], though present during this incident and the Mother's arrest, was left in the home.
A third abuse report was filed alleging that the Mother, the children's Father, and the mother of the Father's other children were doing crack cocaine together. After all of these indicents [sic], the Department made reasonable efforts to keep this family together, leaving the children with the parents and ensuring that services, including substance abuse treatment, were available to the parents.
After the third incident, the children were returned to the Father. Soon after, the children were found wandering near the roadway. Later that same day, the children were removed when [J.J.] was again found wandering alone in the motel complex. Following this incident, the children were adjudicated dependent;
8. These incidents provide the background, but not the reasons for this termination petition. They all occurred prior to the children's removal and prior to the services offered in the case plan.
The petition seeks termination of parental rights on two grounds. The first ground is that the parents continued to abuse, abandon, and neglect their children as evidenced by their failure to substantially comply with their case plans for a twelve month period of time following the children's placement into shelter care. The second ground for termination of the parents' parental rights is that they have engaged in conduct toward the children that demonstrates that the continuing involvement of the parents threatens the life, safety, well-being or physical, mental or emotional health of the children irrespective of the provision of services.
Both parents failed to comply with their case plans. Substantial compliance means that "the circumstances which caused the creation of the case plan have been significantly remedied to the extent that the well-being and safety of the child will not be endangered upon the child's remaining with or being returned to the child's parent." Sec. 39.01(68), Fla. Stat.;
9. The circumstances which resulted in the creation of this case plan stem *233 largely from both parents' drug use. The Drug Abuse Foundation (DAF) twice closed their case regarding the Mother, first in March of 2003, and again on August 2003, due to the Mother failing to appear for treatment. After testing positive for Oxazepam in May, 2003, the Mother finally made herself available for treatment in October 2003. The DAF enrolled her in out-patient treatment in October 2003;
10. By October 30, 2003, the Mother again failed to appear for drug treatment. She resided at a halfway house, Freedom House and followed the program's rules. However, the Father resided at a halfway house, Stephanie's Sober House. When he tested positive for cocaine, he was asked to leave. The Mother admits she made a "mistake" and left with him, despite being encouraged to remain in treatment;
11. In December 2003, DAF transferred the Mother to in-patient treatment. The Mother did complete her in-patient treatment and was moved on to out-patient in February 2004. However, by April 2004, she was failing to show for drug screens and tested positive for cocaine again. DAF discharged her and recommended her for long term residential treatment. The Mother declined;
12. The Mother completed parenting classes during her in-patient stay at DAF. She did not receive her psychological evaluation, until well after the expiration of the case plan. Her housing is unstable. She has been in jail, drug treatment, half-way houses, and at the home of a male who employs her to maintain his books for his pool business. She did not establish housing as required by the case plan. Nor has she had any steady source of income. She did not pay child support. The Mother failed to adequately address her substance abuse problems, despite the services offered under the case plan and the multiple opportunities to engage in those services;
13. The Father failed to comply with his case plan. He made several unsuccessful attempts at substance abuse treatment. The Father rejected further offers for treatment.
The Father was Marchman Acted in June of 2003, for residential treatment following his release from jail on child neglect charges stemming from the removal of his children. He made poor progress and was discharged on September 30, 2003, with a poor prognosis. Shortly after that, the Father tested positive for cocaine on October 16, 2003. Almost immediately he was asked to leave Stephanie's Sober House due to his cocaine use. The Father was offered alternative treatment, i.e., in-patient treatment. He declined. He left the halfway house, taking the Mother with him. As said by the Father with tears streamining [sic] down his face and a plea for forgiveness in his voice, "When I met [D.B.], she had a four bedroom house, pool and a new car. I took her down . . . . She loved me so much, she wouldn't let go." Again in April 2004, the Father tested positive for cocaine;
14. Twice the Father violated his probation on child neglect charges. His probation was reinstated on January 2, 2004. He was violated again on May 6, 2004, for changing his residence without consent, absconding, committing a new law violation and testing positive for cocaine. It was recommended to the Father that he complete the Palm Beach County Drug Farm, a one year in-patient program for substance abusers. He declined. This resulted in his probation being revoked and his incarceration;

*234 15. The Petition for Termination of Parental Rights also cites grounds for termination based upon Sec.39.806(l)(c), Fla. Stat. alleging that the parents have engaged in conduct toward the children that demonstrates that the continuing involvement of the parents in the parent-child relationship threatens the life, safety, well-being or physical, mental or emotional health of the children irrespective of the provision of services. Services, particularly substance abuse services, were made available to both parents for years. Under the case plan, both parents were offered inpatient and outpatient treatment, a number of times. The parents continued to use cocaine throughout the duration of the case plan;
16. By the expiration of the extended case plan, January 16, 2004, both parents were left with the same recommendations regarding their addictions: enter long-term residential treatment programs. The Father was offered this through his probation officer in the form of a one year program at the Palm Beach County Drug Farm. The Mother was offered this through the Drug Abuse Foundation which recommended a long term intensive residential treatment program for her. Both parents declined these offers;
17. Any future provision of services would be futile. The parents are not interested in engaging in further services. Instead, they believe the Mother can go it alone and stay clean by attending meetings. This theory was tested in the past by the parents with disastrous results for the children;
18. [J.J.] was exposed to cocaine in-utero. He was exposed to severe domestic violence while an infant. He and his brother, [C.J.], were allowed to wander onto a busy street while their Father slept. The parents' untreated substance abuse addiction poses a serious threat of harm to the children. The boys would be in physical danger if returned to the parents. They would also suffer mental and emotional harm, if subjected to any more of the parents' chaotic, drug-addicted lifestyle;
19. The lack of stability brought on by the Mother's and Father's addiction influences every aspect of their lives from their housing, to their employment, to their ability to consistently safely and responsibility [sic] parent. This instability continues to this day;
20. The Father is incarcerated as he was when this case commenced. The Mother's housing is not stable. She is staying at her employer's apartment. These children, who have become increasingly fragile as a result of the parents' actions and inactions, can tolerate no further chaos in their young lives. They need stability immediately. Reunification with the parents poses a substantial risk of harm to the children and that termination of parental rights is the least restrictive means of protecting the children;
21. It is in the manifest best interests of the children to terminate parental rights at this time. There are no suitable permanent custody arrangements with a relative. The maternal grandfather is suffering from several illnesses. His housing situation is unstable as he is being forced to move his trailer from where it is currently located in Las Vegas, and at this time, does not know where he will relocate. Things are not going well for him in Las Vegas. Placement with the maternal grandfather would not be stable nor appropriate for the children.
The parents have demonstrated minimal ability to provide for the material *235 needs of their children. They have proven themselves unable to provide stable and adequate housing;
22. The parents do not have the capacity to care for the children to the extent that the children's health and welfare would not be endangered upon the children's return to the parents. The parents are unable to live a drug-free lifestyle. Their lifestyle of choice creates an environment of substantial risk for the children.
Both children's [sic] need a stable, safe, nurturing and permanent home. [J.J.] has therapeutic needs, resulting from the disruption he has suffered in his short lifetime. These needs can be met by freeing the children for adoption.
The parents love their children. The children recognize their Mother. However, the children have been separated from their parents for over a year. Visitation has been sporadic, often due to the parents' incarceration or drug treatment. The degree of harm the children will suffer if parental rights are terminated is not so significant that it would counter balance the children's great need for permanence;
23. The children will be adopted, if parental rights are terminated. They have the ability to form a significant relationship with a parental substitute. They have done so with their current caretakers who wish to adopt them. This has been the children's most stable home and it is highly desirable to maintain this continuity in the children's lives. The children have formed a powerful bond to their present foster family; and
24. The children's Guardians [sic] Ad Litem recommends termination of parental rights. . . .
Based on the facts in this case, as found by the trial court, we hold that the trial court's Order Granting Termination of Parental Rights and Permanent Commitment is supported by clear and convincing evidence and affirm.
Affirmed.
STONE and MAY, JJ., concur.